IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LISA BECHTEL                          *

            Plaintiff              *

        vs.                        *   CIVIL ACTION NO. MJG-10-3381

ST. JOSEPH MEDICAL CENTER, INC. *

            Defendant             *

*       *       *       *       *       *       *       *       *

MEMORANDUM DECISION RE: MOTION TO DISMISS

The Court has before it Defendant St. Joseph Medical
Center's Motion to Dismiss [Document 23] and the documents
related thereto.  The Court finds a hearing unnecessary.


I.   BACKGROUND[1]

    A.   Bechtel's Pertinent Employment Chronology

    Bechtel was employed by St. Joseph Medical Center (the
"Hospital") in early 2000 as a Cardiac Surgery Physician
Assistant.  In her role, she provided professional services for
patients of cardiac surgeons at the Hospital, including Dr. Peter
Horneffer ("Dr. Horneffer").  By 2005, Bechtel was promoted to
the position of Head Physician Assistant for Cardiac Services at
the Hospital.  In 2006, while still employed by the Hospital,
Bechtel took a part time position with Cardiac Surgery

---

[1]    The "facts" herein are as alleged by Plaintiff and are not
necessarily agreed upon by Defendant.

Associates, a professional medical association of which Dr.
Horneffer was a shareholder.  For reasons discussed herein the
Hospital terminated Bechtel's employment on November 23, 2009.


    B.    Factual Allegations

    Starting in 2000, Dr. Horneffer objected to the Hospital's
relationship with Midatlantic Cardiovascular Associates, Inc.
("Midatlantic"), which included the Hospital's paying
inappropriate sums to Midatlantic for referral of lucrative
cardiac procedures.  As a result, Dr. Horneffer stopped receiving
referrals from Midatlantic and had to travel to other locations
to maintain his practice.  In 2004, Bechtel became an integral
part of his practice at the Hospital because she served as a key
liaison with his patients at the Hospital while he was traveling.

    Starting in 2004, the Hospital "precluded Dr. Horneffer from
taking part in any business meetings, medical decisions, or other
actions in which Midatlantic physicians were also involved."  Am.
Compl. ¶ 39.  However, Bechtel was permitted to attend some of
these meetings and conferences.  At these meetings, she became
aware of conversations between the Hospital's management and
Midatlantic doctors that indicated that they wanted to "get rid
of" Dr. Horneffer because of his objections to their business
relationship.  Am. Compl. ¶ 40.

    Bechtel also witnessed conversations between the Chief of

Cardiac Anesthesia and the Chief Medical Officer who was in charge of all staffing matters.  They discussed the need to do "whatever was needed" to remove Dr. Horneffer from practice at the Hospital because his objections "could not be tolerated." Am. Compl. ¶ 40.  Bechtel told Dr. Horneffer about these conversations and about other information concerning the conduct of Midatlantic and the Hospital, and he, in turn, relayed the information to the Government.

Bechtel provided other information to assist Dr. Horneffer in regard to allegations that supported a False Claims Act case brought in this Court against the Hospital and others.  See United States ex rel. Stephen Lincoln, M.D., Peter Horneffer, M.D., and Garth McDonald, M.D. v. St. Joseph Medical Center, MJG-10-1632 ("the Qui Tam Case").  In the Qui Tam Case, the relators asserted that the Hospital submitted false claims to federal health benefit programs by paying remuneration above fair market value to Midatlantic in exchange for referrals and then submitted claims for services that resulted from the remuneration.  For example, Bechtel told Dr. Horneffer that the Hospital ignored the medical mistakes of an incompetent Midatlantic surgeon and sought to punish a nurse because the nurse tried to warn a patient about the incompetent surgeon.  Bechtel informed Dr. Horneffer about Midatlantic's and the Hospital's attempts to divert patients away from Dr. Horneffer to Midatlantic surgeons and to prohibit Dr.

Horneffer from marketing his practice in order to maximize revenues.  Bechtel "became aware that Midatlantic was willing to refer these surgeries to their own surgeons, even if the referrals raised the cost for other medical programs such as Medicare, Medicaid, and private insurance."  Am. Compl. ¶ 46. Bechtel told Dr. Horneffer how, because the surgeons could not operate fast enough, these referrals caused backups and caused patients to incur additional costs.  This occurred even though Dr. Horneffer was underutilized. Finally, Bechtel told Dr. Horneffer that Midatlantic was attempting to cover up a medical malpractice case that led to a large settlement.

In August 2007, the Hospital, in an attempt to remove Dr. Horneffer from the medical staff, instituted a "sham peer review," which was eventually resolved in September 2008 when Dr. Horneffer and the Hospital entered a settlement agreement.  Am. Compl. ¶ 49.  As part of this settlement, the Hospital agreed to help Bechtel further her career and her medical education.

In 2007, Bechtel enrolled at Oceania School of Medicine ("Oceania") because she wanted to be a board-certified Medical Doctor.  Dr. Horneffer took an active role in advancing Bechtel's medical career by taking a part-time position as Associate Dean of Oceania.

In early 2008, Dr. Jeffrey Sell ("Dr. Sell"), a Midatlantic surgeon, became aware of Bechtel's association with Dr.

Horneffer.  On or about February 6, 2008, Dr. Sell wrote a letter to the Vice Chancellor of Oceania falsely accusing Dr. Horneffer of sexually harassing Bechtel, and stated that "it [was Dr. Sell's] duty as her mentor to try to protect her in these circumstances."  Am. Compl. ¶ 54.  Further, Sell stated in the letter that Dr. Horneffer's involvement in Bechtel's education "posed a very real threat to her future."  Id.

In April 2008, Bechtel drafted and submitted an affidavit to Oceania that completely refuted Dr. Sell's allegations and described Dr. Sell's efforts to threaten her into stopping Dr. Horneffer's qui tam lawsuit.  She forwarded her affidavit to the Hospital's managers and she filed a formal complaint with the Hospital's senior management.  But the Hospital's senior management did nothing to help her or to punish Dr. Sell for falsely accusing Dr. Horneffer.  In 2008, Oceania conducted a formal inquiry into Dr. Sell's allegations and concluded that they were unfounded.

In September 2009, the Hospital issued a falsely negative performance appraisal of Bechtel's work, the sole reason for which "was to harass Ms. Bechtel and Dr. Horneffer as punishment for their actions in furtherance of the False Claims Act."  Am. Compl. ¶ 70.  Previously, Bechtel had received "glowing reviews of her job skills" and she had been promoted twice.  Am. Compl. ¶ 71.

Then, in November 2009 the Hospital claimed that Bechtel had improperly left a "wire" in a patient's artery.  Am. Compl. ¶ 75. The Hospital blamed her for the event even though several other doctors had examined the patient after Bechtel.  When Bechtel asked to review the patient's medical records, the Hospital refused and dispatched a security guard to remove her from the Hospital.  Later that month the Hospital conducted a "sham disciplinary action" of Bechtel, in which Bechtel was denied the opportunity to appear before the panel to defend herself.  Am. Compl. ¶ 76.  No one told Bechtel what the panel had reviewed, who was on the panel, or whether the panel's members were biased against her.

Thereafter, and as a direct result of the incident with the wire and the disciplinary action that followed, Bechtel's employment was terminated on November 23, 2009.  Compl. ¶ 77. When Dr. Horneffer investigated her termination, he advised the Hospital that there was no substantive evidence supporting its decision. Nevertheless, the Hospital refused to rescind her termination and it never punished the other doctors who had examined the patient.

Between December 2009 and March 23, 2010, the Hospital provided false, misleading, and inaccurate information about Bechtel to the Board of Physicians of Maryland Department of Health and Mental Hygiene (the "Board").  The Hospital did so in

an attempt to have Bechtel's license to practice medicine as a
Physician Assistant revoked.   Specifically, the Hospital notified
the Board that Bechtel had violated her "delegation agreement"[2]
and that she had been terminated from the Hospital.   Am. Compl. ¶
80.   Although Bechtel may lose her license, the Hospital refuses
to provide her with a copy of the patient's medical records,
which she needs to prepare a proper defense in front of the
Board.

In December 2009, to further harm Bechtel, the Hospital
stopped honoring its agreement with Oceania.   Because of this
abrupt decision, Bechtel could no longer train at the Hospital.
The primary reason for its decision was to harass and intimidate
Bechtel and Dr. Horneffer.

The Hospital then reversed itself and allowed Oceania to use
its campus.   However, the Hospital said that Bechtel's privileges
had automatically terminated when her employment ended because
she no longer had a delegation agreement signed by a sponsoring
physician that would allow her to practice with that physician.
In April and May 2010, Dr. Horneffer told the Hospital that the
State of Maryland had granted Bechtel a delegation agreement
under which he was her delegating physician.   But the Hospital
threatened to terminate Dr. Horneffer if he acted as Bechtel's

---

[2]    A delegation agreement is the agreement establishing the
duties that a supervising physician may delegate to a physician
assistant.   See Desmond v. Yale-New Haven Hosp., Inc., 738 F.

sponsor, so he was therefore unable to help Bechtel.

The Hospital's management told Bechtel that she could have her privileges restored at the Hospital if she had a physician other than Dr. Horneffer act as her delegating physician.  Yet the Hospital should have reasonably known that no physicians would sponsor Bechtel because they would have been aware of the threat the Hospital had made to Dr. Horneffer.

In the summer of 2010, the Joint Commission for the Accreditation of Hospital Organizations (the "Commission") expressed interest in the circumstances surrounding Bechtel's termination.  After learning this, the Hospital's Corporate Responsibility Officer agreed to interview Bechtel.  Bechtel provided documents to the Hospital's officer that detailed Bechtel's actions.  Bechtel also asked the officer to undertake a good-faith review of her termination.  After the interview in September 2010, the officer told Bechtel that she would receive a response in two to three weeks; however, that response never came.

In November 2010, the Hospital entered into a settlement agreement with the United States Government in the amount of $22 Million as consideration for settling claims raised in the Qui Tam Case.

---

Supp. 2d 331, 334 (D. Conn. 2010).

C.   Procedural History

Bechtel filed the Complaint against the Hospital in December 2010.  The Complaint was dismissed without prejudice [Document 17].  Bechtel filed the Amended Complaint [Document 18] in June 2011 asserting claims in three Counts:

Count I    Whistleblower Retaliation, 31 U.S.C. § 3730(h)

Count II   Interference with Economic Relationship

Count III  Wrongful Employment Termination

By the instant motion, the Hospital seeks dismissal of all charges.

II.  DISMISSAL STANDARD

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint.  A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted).  When evaluating a 12(b)(6) motion to dismiss, a plaintiff's well-pleaded allegations are accepted as true and the complaint is viewed in the light most favorable to the plaintiff.  However, conclusory statements or a "formulaic recitation of the elements of a cause of action" will not suffice.  Id.  A complaint must allege

sufficient facts to "cross 'the line between possibility and plausibility of entitlement to relief.'"  Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Twombly, 550 U.S. at 557).

Inquiry into whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.  Thus, if the well-pleaded facts contained within a complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1950 (2009))(internal quotation marks omitted).


III.  DISCUSSION

A.   Count I – Whistleblower Retaliation

In Count I, Bechtel alleges that the Hospital illegally threatened, harassed, and discriminated against her in the terms and conditions of her employment because she lawfully provided Dr. Horneffer, her associate, with information that furthered his action under the False Claims Act.  These actions, she alleges, caused her to be illegally discharged and have significantly limited her ability to pursue her medical degree and career as a physician.

The Hospital seeks dismissal of Count I on the ground that Bechtel fails to plead adequately that (1) she acted in furtherance of the Qui Tam Case and (2) that the Hospital had knowledge of her involvement or assistance with the Qui Tam Case.

Accordingly, the questions presented include:

1. Whether Bechtel must adequately plead that she personally acted in furtherance of the Qui Tam case or can recover by virtue of her association with Dr. Horneffer who so acted.

2. Whether Bechtel has adequately pleaded that the Hospital had notice of her pertinent actions or association with Dr. Horneffer.

During the period pertinent to the instant case, § 3730(h) was twice amended.  Accordingly, it is necessary to consider the viability of Bechtel's claims under three different versions of the statutory provision, i.e. the pre-May 20, 2009 version (the "1986 Version"),[3] the version in effect from May 20, 2009 to July 10, 2010 (the "FERA Version")[4] and the post-July 21, 2001 version (the "Dodd-Frank Version").[5]

1.   Pre-March 20, 2009 Claims (1986 Version)

From 1986 until May 20, 2009, 31 U.S.C. § 3730(h) provided, in pertinent part:

(h) Any employee who is . . . in any . . .

---

[3]   31 U.S.C. § 3730(h), Pub. L. No. 99-562 (October 27, 1986).
[4]   31 U.S.C. § 3730(h), as amended by the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21.
[5]   31 U.S.C. § 3730(h), as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203.

11

> manner . . . discriminated against in the
> terms and conditions of employment by his or
> her employer because of lawful acts done by
> the employee on behalf of the employee or
> others in furtherance of an action under this
> section, including investigation for,
> initiation of, testimony for, or assistance in
> an action filed or to be filed under this
> section, shall be entitled to all relief
> necessary to make the employee whole.

§ 3730(h) 1986 Version.


      a.   <u>In Furtherance</u>

The 1986 Version of the statute essentially states that a cause of action will lie when there has been retaliation "because of <u>lawful acts done by the employee</u> on behalf of the employee or others in furtherance of an action under this section."  31 U.S.C. § 3730(h), 1986 Version (emphasis added).  The statute unambiguously required Bechtel to have taken lawful acts in furtherance of the Qui Tam action.  Accordingly, Bechtel must allege that she, herself, did acts in furtherance of Dr. Horneffer's development of the Qui Tam Case.  Bechtel has done so.

Bechtel alleges that she regularly "pass[ed] along any information regarding [the Hospital's] and/or Midatlantic's illegal activities which, Dr. Horneffer, in turn, would pass on to the United States in furtherance of the False Claims Act case he filed."  Am. Compl. ¶ 24.  Specifically, she alleges that she was present at meetings that Dr. Horneffer was excluded from that

were attended by representatives of the Hospital and Midatlantic physicians.  See Am. Compl. ¶ 39.  Bechtel thus became aware of conversations that Dr. Horneffer was not privy to between the Hospital's management and Midatlantic doctors that indicated that they wanted to "get rid of" Dr. Horneffer because of his objections to the referral structure that was integral to their business relationship.  See Am. Compl. ¶ 40.  She also became aware that the Chief of Cardiac Anesthesia at the Hospital felt that Dr. Horneffer was threatening his group's prosperity, which depended on the referrals from Midatlantic.

As this referral structure was at the heart of the False Claims Act case ultimately settled by the Hospital, for which Dr. Horneffer was a relator, Bechtel's claims that her actions furthered that action are plausible at this stage and are not subject to dismissal on this basis.

This is so despite the Hospital's argument that "an individual acts 'in furtherance of' a qui tam lawsuit only where she 'initiated, testified for, or assisted in the filing' of the matter."  Reply Mot. Dismiss 5 (emphasis added) (citing Zahodnick v. IBM, 135 F.3d 911, 914 (4th Cir. 1997)).

The 1986 Version of § 3730(h) provides a remedy for acts in furtherance of a qui tam lawsuit "including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed." § 3730(h) (1986 version) (emphasis added).  The

13

protected activities enumerated by the statute are not an

exhaustive list.  As this Court noted in United States ex rel.

Ackley v. IBM:

> Nor is the language of Section 3730(h) by any fair
> construction all-inclusive.  Although the statute
> expressly lists "investigation for" a qui tam action
> (and does not list "reporting fraud") among its
> examples of protected activity, the legislative history
> indicates that "protected activity should . . . be
> interpreted broadly."  S. REP. NO. 99-345, at 35
> (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5300; see
> United States ex rel. Yesudian v. Howard Univ., 332
> U.S. App. D.C. 56, 153 F.3d 731, 741 (D.C. Cir.
> 1998) (noting that statute's examples are not "intended
> . . . to encompass the entire category"); United States
> ex rel. McKenzie v. BellSouth Telecomm., Inc., 123 F.3d
> 935, 944 (6th Cir. 1997) (same).

110 F. Supp. 2d 395, 400 (D. Md. 2000).

Because Bechtel plausibly alleges that she acted in

furtherance of Dr. Horneffer's qui tam action by passing relevant

information to him, she has adequately pleaded the "in

furtherance of" aspect of her claim.


b.   Knowledge

To establish a valid claim for retaliatory discrimination

under the 1986 Version of the False Claims Act, it is not enough

to plead that the employee took actions in furtherance of a qui

tam suit.  An employee must also prove that her employer knew of

her taking these actions.  Zahodnick v. IBM, 135 F.3d 911, 914

14

(4th Cir. 1997).[6]

The Fourth Circuit has explained this notice requirement:

Such notice can be accomplished by expressly stating an intention to bring a qui tam suit, but it may also be accomplished by any action which a factfinder reasonably could conclude would put the employer on notice that litigation is a reasonable possibility. Such actions would include, but are not limited to, characterizing the employer's conduct as illegal or fraudulent or recommending that legal counsel become involved. These types of actions are sufficient because they let the employer know, regardless of whether the employee's job duties include investigating potential fraud, that litigation is a reasonable possibility.

Eberhardt v. Integrated Design & Constr., Inc., 167 F.3d 861, 868 (4th Cir. 1999).

As Judge Bennett recently observed, "The employer must have knowledge or notice of the possibility of qui tam litigation, because without that requisite knowledge, it would be impossible for the employer to retaliate against the employee." United States, ex rel. Parks v. Alpharma Inc., No. RDB-06-2411, 2011 WL 1366491 at *6 (D. Md. Apr. 11, 2011). A plaintiff need not have used specific "buzzwords," such as "fraudulent" or "false." Id. The central question is whether the employer should have reasonably understood the possible follow-on of qui tam litigation from the employee's complaints or other actions. See

---

[6]   To make a successful claim for retaliatory discrimination under the False Claims Act, an employee must prove (1) that the employee took acts in furtherance of a qui tam suit; (2) her employer knew of these acts; and (3) her employer discharged her as a result of these acts. Zahodnick v. IBM, 135 F.3d 911, 914 (4th Cir. 1997) (applying 1986 Version).

Eberhardt, 167 F.3d at 868; United States ex rel. Ackley v.

Intn'l Bus. Mach. Corp., 110 F. Supp. 2d 395, 401 (D. Md. 2000).

Bechtel alleges that:

> Starting in 2000 and continuing up through the present,
> SJMC knew, or reasonably should have known, that Dr.
> Horneffer objected to SJMC's business relationship with
> Midatlantic and was acting in furtherance of the False
> Claims Act. On numerous occasions, starting in 2000,
> Dr. Horneffer made clear to senior SJMC management that
> SJMC's business relationship with Midatlantic was
> illegal and it harmed patient care. Dr. Horneffer
> repeatedly requested that SJMC sever its business
> relationship with Midatlantic and its referring
> cardiologists and, instead, enter into business
> relationships with cardiologists who placed patient
> care above profits.

Am. Compl. ¶ 23.

Bechtel argues that she makes the following additional

averments regarding the Hospital's state of knowledge: (1) the

Hospital reasonably could be expected to have known as early as

2000 that Bechtel worked closely with Dr. Horneffer, Am. Compl. ¶

24; (2) the Hospital knew that by 2006 Bechtel had taken a part-

time position as an employee in Dr. Horneffer's practice, id. ¶

37; and (3) as of April 14, 2008, the Hospital was fully aware

that Bechtel supported Dr. Horneffer's efforts to stop the

Hospital's illegal conduct because she drafted and submitted to

Oceania and the Hospital an affidavit refuting the allegations of

sexual harassment lodged by Dr. Sell against Dr. Horneffer, id.

¶¶ 24, 61-66.  The affidavit reflected that Dr. Sell had a motive

to "destroy" the careers of Dr. Horneffer and his associates

16

because Dr. Horneffer had sued Dr. Sell and other Midatlantic doctors in Maryland state court over their business practices. Id. ¶¶ 60-61; Opp'n Mot. Dismiss 38.  The affidavit also reflected that Dr. Sell had confronted Bechtel multiple times over a 2-day period in an effort to intimidate her into "find[ing] a way to stop this lawsuit" or he would "make life very unpleasant" for her, including subpoenaing her phone records to "embarrass him, [her], and his wife."  Am. Compl. ¶¶ 61-63.

These allegations do not plausibly allege that the Hospital had a "sufficient amount of knowledge" of the acts that Bechtel was taking[7] in furtherance of Dr. Horneffer's qui tam action to put the Hospital on notice of the possibility of future qui tam litigation such that the Hospital could have plausibly acted out of retaliation before May 20, 2009.

On the other hand, although the qui tam lawsuit in which Dr. Horneffer served as a government relator was not actually filed until June 2010, Bechtel does plead that the Hospital was on notice during this period that Dr. Horneffer was acting in furtherance of a qui tam action based on his numerous complaints to Hospital management that its relationship and referral

---

[7]     As described above, the 1986 Version of the False Claims Act retaliation provision only provides a remedy for retaliation against an employee who personally took action in furtherance of a qui tam action.  Under this version, an employee must prove (1) that the employee took acts in furtherance of a qui tam suit; (2) her employer knew of these acts; and (3) her employer discharged her as a result of these acts.  Zahodnick v. IBM, 135 F.3d 911,

structure with Midatlantic was illegal.  However, Bechtel does not claim to have made any similar complaints to the Hospital. While Bechtel alleges that the Hospital should have known that she would support Dr. Horneffer's qui tam action, Bechtel's mere association with him is not enough to satisfy the notice standard under the 1986 version of the False Claims Act.

The allegations relating to her 2008 affidavit denying Dr. Sell's sexual harassment claims also do not satisfy the notice requirement.  Bechtel does not allege that Dr. Sell's threats were due to any legitimate action that <u>she</u> took "in furtherance of an action" under the 1986 Version.  Although Dr. Sell's behavior, if Bechtel's allegations are true, would be disturbing, it would not tend to establish that he or the Hospital had a "sufficient amount of knowledge" that Dr. Horneffer was going to file a qui tam suit and that Bechtel was acting in furtherance of that suit.  Bechtel makes the allegation that Dr. Sell tried to intimidate Bechtel because of <u>Dr. Horneffer's acts</u> in furtherance of the Qui Tam Case but does not plead that the threats were due to Bechtel's actions as distinct from her association with Dr. Horneffer.

Accordingly, due to Bechtel's failure to plead adequately the requisite knowledge of <u>Bechtel's</u> alleged actions in furtherance of the Qui Tam Case, Bechtel's claims for alleged

---

914 (4th Cir. 1997) (applying 1986 Version).

acts of retaliation that took place before May 20, 2009 shall be dismissed.

### 2.   FERA Version

From May 20, 2009 until July 21, 2010, 31 U.S.C. § 3730(h) provided:

> h) Relief from retaliatory actions.
>
> > (1)   In general. Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of other efforts to stop 1 or more violations of this subchapter.

§ 3730(h) FERA Version.

### a.   In Furtherance

The question presented is whether the phrase "lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others" includes lawful acts done by an "associated other" in addition to acts by "the employee, contractor, or agent."  The legislative history supports a construction that would do so.[8]  Of course, it is

---

[8]   One of the co-sponsors of FERA's False Claims Act

necessary to apply the statute as actually enacted, and not what
the legislature may have said they intended.  See United States
v. Bell, 5 F.3d 64, 68 (4th Cir. 1993).

The provision states "lawful acts done by the employee,
contractor, or agent on behalf of the employee, contractor, or
agent or associated others."  This literally provides for "lawful
acts done by the employee, contractor, or agent on behalf of the
employee, contractor, or agent or [lawful acts done by]
associated others."  If the provision were drafted to state what

_____

amendments, Representative Howard L. Berman, stated:

> I rise today in support of the Fraud Enforcement &
> Recovery Act of 2009. . . . [N]ow is the time to plug
> the loopholes that have been created in the False
> Claims Act over the last quarter century. . . . As one
> of the authors of both the 1986 False Claims Act
> amendments and the relevant language in S. 386 which we
> consider today, I submit this statement to clarify the
> true intent of the False Claims Act. . . . Section
> 3730(h) of the False Claims Act . . . needs to be
> amended so that it is clear that it covers the
> following types of retaliation that whistleblowers
> commonly have faced over the course of the last twenty
> years: . . . retaliation against the family members and
> colleagues of those who have blown the whistle. . . .
> To address the concern about indirect retaliation
> against colleagues and family members of the person who
> acts to stop the violations of the False Claims Act,
> Section 4(d) clarifies section 3730(h) by adding
> language expressly protecting individuals from
> employment retaliation when "associated others" made
> efforts to stop False Claims Act violations. This
> language is intended to deter and penalize indirect
> retaliation by, for example, firing a spouse or child
> of the person who blew the whistle.

155 Cong. Rec. E 1295, 1300 (daily ed. June 3, 2009).

the Hospital wishes, the legislation would have to eliminate the second "or" and add a comma after the second "agent."  Therefore, the provision would have to be edited to state "lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, ~~or~~ agent[,] or associated others."

The Court must observe that the provision, as written, does not carry out the legislative intent to include <u>both</u> retaliation for acts done by an employee on behalf of associated others and for acts done by an associated other.  Rather, by clear inadvertence, while the provision adds coverage for retaliation for acts done by an associated other, it eliminates coverage for retaliation for acts done by an employee on behalf of an associated other.  This matter is moot in the instant case due to Bechtel's failure to adequately plead knowledge with regard to her own actions on behalf of Dr. Horneffer.  Accordingly, the Court concludes that under the FERA version of § 3730(h), a cause of action will lie when an employer has retaliated against an employee because of lawful acts done by an associated other in furtherance of a qui tam action.[9]

Therefore, as to acts of retaliation alleged while the FERA version of § 3730(h) was in effect from May 20, 2009 through July

---

[9]   Whether such an action would lie for actions of the employee herself on behalf of associated other is a moot question in the instant case due to the absence of adequate pleading to establish the requisite knowledge.

21, 2010,[10] Bechtel has pleaded a plausible claim under § 3730(h)
on the theory that she was retaliated against for the actions
that Dr. Horneffer took in furtherance of the Qui Tam Case.


      b.   <u>Knowledge</u>

An employee must plead that her employer knew of these acts
being taken in furtherance of a qui tam action such that the
employer was on notice that qui tam litigation was a reasonable
possibility. <u>See</u> <u>Eberhardt v. Integrated Design & Constr.</u>, Inc.,
167 F.3d 861, 868 (4th Cir. 1999); <u>Zahodnick v. IBM</u>, 135 F.3d
911, 914 (4th Cir. 1997). As discussed above, Bechtel has not
adequately pleaded such knowledge as to any actions taken by her.
However, Bechtel has adequately pleaded knowledge that Dr.
Horneffer, an "associated other" <u>vis-à-vis</u> Bechtel, was taking
actions in furtherance of the Qui Tam Case suit and that the
Hospital knew she was associated with Dr. Horneffer. For
example, Bechtel alleges that from early 2000, "on numerous
occasions" Dr. Horneffer "made clear to senior [Hospital]
management that [the Hospital's] business relationship with

---

[10]   During this period, Bechtel alleges that the Hospital (1)
issued a falsely negative performance appraisal of her work, Am.
Compl. ¶ 70; (2) improperly fired Bechtel, <u>id.</u> ¶ 74; (3) filed a
false and misleading report to the Maryland Board of Physicians
accusing Bechtel, <u>id.</u> ¶ 79; (4) further attempted to derail her
medical education, <u>id.</u> ¶ 85; and (5) refused to grant Bechtel
privileges to work at the Hospital under a delegation agreement,
<u>id.</u> ¶ 87. Some of these actions occurred after the termination
of Bechtel's employment, the import of which is discussed below.

Midatlantic was illegal." Am. Compl. ¶ 23.  Bechtel alleges that
as of April 14, 2008, the Hospital was aware that Dr. Horneffer
had sued Dr. Sell and other Midatlantic physicians in state
court.  Bechtel also alleges throughout her complaint that the
Hospital was aware that she worked closely with Dr. Horneffer as
a physician assistant, that by 2006 she had taken a part time
position as an employee in his practice, and that by April 2008
the Hospital was aware that Dr. Horneffer was helping her pursue
her medical degree from Oceania.

Therefore, under the FERA version of § 3730(h), Bechtel has
sufficiently alleged that the Hospital was on notice that Dr.
Horneffer was taking actions in furtherance of a qui tam suit and
that she was associated with Dr. Horneffer.


c.   <u>Post-Termination Retaliation</u>

Bechtel alleges that the Hospital took the following
retaliatory actions between May 20, 2009 and July 21, 2010:

<u>September 2009</u>: Issued a falsely negative performance
appraisal of her work, Am. Compl. ¶ 70;

<u>November 23, 2009</u>: Improperly discharged Bechtel, <u>id.</u> ¶ 74-
77;

<u>Between December 2009 and March 23, 2010</u>: Filed a false and
misleading report to the Maryland Board of Physicians
accusing Bechtel, <u>id.</u> ¶ 79;

<u>December 2009</u>: Further attempted to derail her medical
education, <u>id.</u> ¶ 85; and

<u>Between December 2009 and May 2010</u>: Refused to grant Bechtel

privileges to work at the Hospital under a delegation agreement, id. ¶ 87.

The Hospital contends that § 3730(h) does not provide a remedy for post-termination activities.

All three versions of § 3730(h) expressly provide relief when an employee "is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment."  This language is not reasonably interpreted to include post-termination retaliatory actions.  Indeed, it appears that all courts considering the issue have held that § 3730(h) does not provide a remedy for acts of retaliation subsequent to termination.  See United States ex rel. Wright v. Cleo Wallace Ctrs, 132 F. Supp. 2d 913, 928 (D. Colo. 2000) (dismissing plaintiff's allegations of defendant's retaliatory conduct following plaintiff's discharge, but allowing allegations of defendant's conduct prior to his discharge to proceed); Lehoux v. Pratt & Whitney, 2006 WL 346399 at *2 (D. Me. 2006) ("It is apparent to me that [Plaintiff's] cause of action under the FCA accrued at the latest on the date he was terminated"), report and recommendations adopted, 2006 WL 616057 (D. Me. 2006)); United States ex rel. Head v. Kane Company, 2011 WL 3010610 at *14 (D.D.C. 2011) (holding that "the plain language of" section 3730(h) "applies only to the employment context and, therefore, cannot extend to claims for retaliatory action occurring solely after a Plaintiff has been terminated from his

24

job"); <u>United States ex rel. Davis v. Lockheed Martin Corp.</u>, 2010 WL 4607411 at *8 (N.D. Tex.) (section 3730(h) "does not contemplate recovery for post-employment conduct").  Bechtel has proffered no contrary legal authority and the Court has found none.

Accordingly, the Court holds that Bechtel's claims pertaining to post-termination retaliatory action shall be dismissed.

3.   <u>Dodd-Frank Version</u>

Beginning July 21, 2010, § 3730(h) has provided, in pertinent part:

> (h) Relief from retaliatory actions.-
>
> (1) In general.--Any employee, contractor, or agent . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is . . . in any . . . manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

§ 3730(h) Dodd-Frank Version.

By eliminating the "on behalf of" phrase, the Dodd-Frank version rather clearly provides that a cause of action is available when an employee is retaliated against because of acts done by the employee or by an associated other.  However, in the instant case, any retaliatory actions that may have taken place

25

after July 21, 2010 were, of course, post-termination actions. Accordingly all claims based upon such actions shall be dismissed.

### B.    Count II - Interference With Economic Relationships

Bechtel alleges that the Hospital caused "significant loss of income generated from her profession as a PA and a delay in her education to become a Medical Doctor, as well as damage to her professional reputation."  Am. Compl. ¶ 107.

The Hospital contends that this claim must be dismissed because (1) a party cannot interfere with its own economic relationship, and (2) a party cannot interfere with a purely speculative future economic relationship.

Bechtel responds that this claim should proceed because "the Hospital's conduct was calculated to ruin her career and preclude her from ever engaging in her profession again."  Opp. Mot. Dismiss at 40.  According to Bechtel, the Hospital's improper termination of her employment, its report to the Board of Physicians, and the Hospital's efforts to derail Bechtel's medical training at the Hospital "have had, and will continue to have, an adverse impact on her ability to work in her chosen profession as a Physician Assistant at other hospitals" and "has harmed her ability to become a medical doctor."  Opp'n Mot. Dismiss 41.  In sum, her claim is that "the Hospital's conduct

26

constituted a tortious interference with future economic relationships." Id. at 42.

In Maryland, "the two general types of tort actions for interference with business relationships are inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract." K & K Management, Inc. v. Lee, 557 A.2d 965, 973 (Md. 1989) (internal quotation marks and citation omitted). For the latter type, a plaintiff must show "'(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.'" Kaser v. Fin. Prot. Mktg., 831 A.2d 49, 53 (Md. 2003) (quoting (Willner v. Silverman, 71 A. 962, 964 (Md. 1909)).

"The tort of wrongful interference with economic relations will not lie where the defendant is a party to the economic relationship with which the defendant has allegedly interfered." Kaser, 831 A.2d at 54. Therefore, to the extent that Bechtel's claim against the Hospital concerns the Hospital's termination of Bechtel's employment, this claim must be dismissed.[11]

Bechtel cites the seminal Maryland case of Willner v.

---

[11]    This much Bechtel concedes. Opp'n Mot. Dismiss 40.

Silverman, 71 A. 962, 964 (Md. 1909), for the proposition that an employer may be sued for intentional interference with business relationships when it fires an employee and then attempts to harm that employee's future job prospects.  In that case, the plaintiff's employer wrote a letter containing false statements that notified members of a trade association that he had fired the plaintiff, requested them not to give him employment, and the plaintiff was subsequently refused employment by members of the association.  Id.

In Baron Fin. Corp. v. Natanzon, 471 F. Supp. 2d 535 (D. Md. 2006), this Court concluded that, under Maryland law, a plaintiff could not bring "a claim for tortious interference with unknown future prospective business relationships."  Id. at 542. Magistrate Judge Gauvey found that the issue of "how certain the anticipated business relationship must be before a party may bring a claim seeking damages for the disruption of the relationship" was an issue of first impression in Maryland that had not yet been determined by the Maryland Court of Appeals. Id.  She considered other sources of law:

> Under the Reporter's Notes to the Restatement (Second) of Torts, "an individual must allege more than a disruption of a future relationship to a yet to be determined party -- a "reasonable probability" must be shown that a contract will arise from the parties' current dealings." Reporter's Note to the Restatement (Second) of Torts § 766B. Similarly, every state which has addressed the issue has found that the party must establish some evidence that a prospective business relationship is likely to occur.  The Court concludes

that Maryland Courts would rule that plaintiffs must
identify a possible future relationship which is likely
to occur, absent the interference, with specificity.

Id. at 542-46 (citing cases from 22 states holding that the mere
expectation or hope of a prospective relationship is not
sufficient for a plaintiff to recover under this tort).

In view of the absence of definitive Maryland authority as
to the level of certainty required, the Court finds it
appropriate to reserve judgment on the claims in Count II and
decide upon the adequacy of Bechtel's case in light of the
evidence she produces in response to a summary judgment motion.

Accordingly, the Court holds that the claim for interference
with business relationships, except as it relates to the alleged
wrongful discharge that is the subject of Count I, shall remain
pending.


C.   Count III - Wrongful Termination

Bechtel avers that the Hospital wrongfully terminated her
employment in violation of "the avowed public policy of the State
of Maryland . . . to encourage citizens to resist and to report
unethical and illegal conduct in the healthcare industry . . .
[and] assist in the investigation of illegal and unethical
activities and to support those who are investigating illegal
activities."  Am. Compl. ¶ 116.

Maryland recognizes the tort of wrongful discharge "when the

29

motivation for the discharge contravenes some clear mandate of public policy." Adler v. Am. Standard Corp., 432 A.2d 464, 473 (Md. 1981). However, "[a]busive discharge is inherently limited to remedying only those discharges in violation of a clear mandate of public policy which otherwise would not be vindicated by a civil remedy." Makovi v. Sherwin-Williams Co., 561 A.2d 179, 180 (Md. 1989), see also Watson v. Peoples Sec. Life Ins. Co., 588 A.2d 760, 766 (Md. 1991) (discrimination claims covered by Title VII of the Civil Rights Act of 1964 do not create an independent claim for abusive discharge because Title VII provides its own remedy for any violation).

The retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h), provides a civil remedy for employees who have been discharged after assisting in or bringing qui tam actions. See Zahodnick v. IBM, 135 F.3d 911, 914 (4th Cir. 1997). Maryland law "precludes the use of the wrongful discharge tort to recover in the name of the same public policy interest." Glynn v. EDO Corp., 536 F. Supp. 2d 595, 616 (D. Md. 2008) (granting motion to dismiss claim for wrongful discharge in violation of Maryland public policy while allowing retaliation claim under the False Claims Act to proceed); see also Zahodnick, 135 F.3d at 914 ("We conclude that § 3730(h) adequately covers Zahodnick's claim.").

In the instant case, Bechtel's wrongful termination claim is predicated on the same actions as her retaliation claim under the

False Claims Act.  Although she argues that her wrongful discharge termination claim is broader than the activities remedied by the False Claims Act[12] and should not be dismissed, she has provided no authority establishing a "clear mandate" of public policy that supports her claim.  See Adler, 432 A.2d at 473.

Therefore, this Court concludes that § 3730(h) adequately covers Bechtel's claim, and the motion to dismiss Count III is granted.

---

[12]   In her Opposition, Bechtel notes that in addition to assisting Dr. Horneffer in "exposing financial improprieties actionable under the False Claims Act," her assistance "also exposed patient mistreatment arising from the Hospital's accommodation of [Midatlantic's] activities" and "provided information regarding the Hospital's attempts to hide vital information from patients about the caliber of [Midatlantic's] doctors."  Opp'n Mot. Dismiss 47.

IV. <u>CONCLUSION</u>

For the aforementioned reasons,

1. Defendant St. Joseph Medical Center's Motion to Dismiss [Document 23] is GRANTED IN PART and DENIED IN PART.

2. All claims in Count I are dismissed except for claims based upon the September 2009 performance appraisal and the November 2009 termination of employment.

3. All claims in Counts II remain pending except those relating to the alleged wrongful discharge that is a subject of the pending claims in Count I.

4. All claims in Count III are dismissed.


SO ORDERED, this <u>Thursday, April 26, 2012</u>.



_____/s/_____
       Marvin J. Garbis
    United States District Judge

32